IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIMINAL ACTION** |
| ) | |
| v. ) | No.  07-10221-09-MLB |
| ) | |
| ISAAC WOODS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion to suppress. (Doc. 81). The motion is fully briefed and the court conducted an evidentiary hearing on April 16, 2008. (Docs. 81, 98). The motion to suppress is denied for the reasons herein.

**I.  FACTS**

This case arises from a traffic stop that occurred on June 25, 2007, around 6 p.m. in Wichita, Kansas. Earlier in the afternoon, Detective Ron Goodwin, a member of the Wichita Police Gang Task Force, was surveilling a house at 1821 S. Ridgewood owned by Tyrone Andrews, a co-defendant in this case. The department was utilizing both a surveillance team and a confidential informant (CI) to gain information about Andrews. Andrews had been under surveillance since February 2007. The surveilling officers observed that Andrews appeared at the house only in the afternoons and early evenings. Otherwise, the house seemed to be unoccupied. After leaving the house, Andrews would make quick stops at other locations in Wichita where he would remain only for a few minutes. Goodwin testified that based on his experience, this behavior indicates that a drug

transaction is being conducted at each stop. Goodwin's opinion in this regard has not been challenged.

In May 2007, the CI informed Goodwin that Andrews bought and sold cocaine by the kilogram. On June 4, 2007, the agents searched the trash container at the house on Ridgewood. The container contained an empty box. The box, which originally held sandwich bags, an item that is commonly used for packaging drugs, tested positive for the presence of cocaine. On June 23, 2007, two days prior to defendant's stop, the CI made a controlled buy of two ounces of cocaine from Andrews.

At 4:00 p.m. on June 25, Goodwin set up surveillance at the Ridgewood address. Andrews arrived and a short time later, a small Nissan arrived and stayed less than five minutes. The Nissan had also been observed at another location that was under surveillance in connection with the investigation. The Nissan left, followed by Andrews, who drove to an apartment complex.

Detective Miller, who was surveilling the complex, saw Andrews leave. Miller informed Goodwin that Andrews was carrying a black bag which appeared to be very light and was blowing in the wind. Andrews was accompanied by Kevin Gunter, who was carrying a white bag. The surveillance team followed Gunter to a location on Glendale Street, where he approached defendant, who was standing next to a maroon Intrepid. Gunter handed defendant a white package. Defendant placed the package in the back seat of the Intrepid. The contact between defendant and Gunter only lasted seconds.

The surveillance team then followed defendant, who drove to the area of Douglas and Oliver. A member of the team called dispatch and

requested a marked unit to assist in stopping defendant. Wichita Police Officer Michael Cox responded to the call with his partner, Officer Cole. Cox observed the Intrepid and pulled in behind it. Defendant then entered the parking lot at Lincoln Heights Shopping Center. Cox observed that defendant failed to turn on his signal 100 feet prior to the turn. Cox did not follow defendant into the parking lot and was instructed by a member of the surveillance team to leave the area.

Once in the parking lot, defendant stopped his car and got out. He walked up to a shoe store, stood at the door, looked back in the direction of the now absent marked police vehicle, and returned to his car without attempting to enter the shoe store, which was still open for business. Defendant then entered his car and left the shopping area. A member of the surveillance team again requested Cox to resume following defendant. When Cox observed the Intrepid, it made a right turn from a private drive and entered the center lane, instead of turning into the curb lane. Cox erroneously believed that defendant violated a traffic regulation and activated his emergency lights. Cox later learned from a fellow officer that the traffic maneuver defendant made was correct because the curb lane ended in approximately fifteen to twenty feet.[1]

Cox made contact with defendant and told him why he was stopped. Cox requested insurance information and defendant produced it. Cox

---

[1] Cox testified that because he later learned that defendant had not committed a traffic violation when he turned into the center lane, the issued citation should have been for defendant's failure to signal at least 100 feet prior to turning into the shopping center. The court carefully observed Cox and finds that Cox's error was innocently made.

returned to his patrol car to check for "wants and warrants" and, after determining that defendant did not have any outstanding warrants, Cox wrote a violation for making an improper turn. When Cox delivered the ticket to defendant, he observed that the windows were down on the driver's side. Cox testified that he smelled a strong odor of air freshener and marijuana.[2] The entire duration of the stop lasted approximately five to ten minutes. Defendant started his car and began to drive off. Cox turned around and asked defendant if he could ask him some more questions. Defendant stated "what." Cox asked defendant if there was anything illegal in the car. Defendant replied "no." Defendant then again attempted to drive away. Cox told him to stop and get out. Defendant did so and did not close the driver side door behind him.[3] Defendant was asked if the officers could search his vehicle and defendant said no.

Wichita Police Officer Jesse Handcock, a member of the canine unit, was at the scene during the stop. After defendant got out of his car, Handcock deployed his dog. Handcock follows a standard procedure. He always has the dog go around the car twice counterclockwise and then once clockwise. The dog is not on a leash. During the first pass, the dog sniffs the lower part of the car. The

---

[2] Cox, however, did not list that information in his report. While this omission may suggest that Cox could benefit from some additional training regarding report writing, the court does not find that Cox was being untruthful, especially in view of defendant's admission that he had smoked marijuana in the car.

[3] In his memorandum and through cross-examination of officers at the hearing, defendant suggested that he closed the door when he got out of the car and that an officer later opened it. The court accepts the officers' testimony that defendant left the driver's door open when he got out. Stated another way, there is no credible evidence that officers opened the door so that the dog could enter the car.

second pass is concentrated on the middle part of the car and the third pass is targeted on the upper part of the car. On the first pass, the dog "alerted" to the trunk.[4] Basically, the dog broke command by stopping and reversing to again smell the corner of the trunk. The dog, however, did not "indicate" that there was a scent of drugs. The dog did not alert or indicate on the second pass. On the third pass, the dog alerted at the passenger side window. The dog stuck his head in the window and then went around the car and entered it on the driver's side through the open door. The dog indicated at the center console by scratching at the console. Handcock asked defendant if there were any drugs in the console. Defendant said there were no drugs but he had smoked marijuana in the car earlier.

Handcock entered the car and immediately smelled marijuana. After searching the center console, Handcock found marijuana residue. Handcock then removed the keys from the ignition and the trunk was opened with the keys. Inside the trunk, the officers discovered two white packages that were inside a white bag. The two packages tested positive for crack. Once the trunk was opened, Handcock redeployed his dog. The dog indicated at the trunk by scratching. Officers arrested defendant for possession of the cocaine.

**II. ANALYSIS**

Defendant asserts that the stop and subsequent search of his car wer unconstitutional and asks that all evidence seized in that search

---

[4] Handcock explained that an "alert" occurs when the dog breaks command, i.e. stops and reverses to sniff an area again. An "indication" occurs when the dog either scratches, barks or bites at an area. Handcock testified that, in his opinion, an indication would give probable cause to search the vehicle but an alert would not.

be suppressed.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief." See Delaware v. Prouse, 440 U.S. 648, 653 (1979). "Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," the stops are analyzed under the principles articulated in Terry v. Ohio. United States v. King, No. 05-6399 (10th Cir. Dec. 18, 2006). The two-pronged standard espoused in Terry v. Ohio, 392 U.S. 1 (1968), thus applies, see United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001), and renders a traffic stop reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. An initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

The court finds that Cox was justified in stopping defendant's car in the first instance. The court accepts Cox's testimony that he believed defendant committed a traffic violation when he observed defendant turn into the center lane and failing to turn into the lane closest to the curb and when Cox observed defendant failing to signal in advance of his turn into the shopping center. See K.S.A. § 8-

1545(a)(1) (stating that the "driver of a vehicle intending to turn [right] shall do so . . . as practicable to the right-hand curb or edge of the roadway."); § 8-1548(b) (describing appropriate signaling methods). Even though Cox later was informed that defendant's failure to turn into the right lane was not a violation because the lane ended in approximately twenty feet, Cox believed at the time of the stop that defendant had in fact committed a traffic violation. The court finds that Cox' belief was reasonable at the time of the stop.

Even when the initial stop is valid, any investigative detention must not last "longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). The uncontroverted testimony shows that Cox approached defendant's car upon initially stopping him and then obtained defendant's driving documents. Cox returned to his patrol car to run a search for outstanding wants or warrants, which was appropriate. Cox re-approached defendant's car and returned defendant's papers and issued a citation. Therefore, the scope of the traffic stop was reasonably related in scope to the circumstances which initially justified the interference. Terry, 392 U.S. at 20.

After the purpose of the traffic stop is complete, however, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible. Bradford, 423 F.3d at 1156-57. In general, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two

circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349.

In this case, Cox's further questioning of defendant was not consensual. Defendant was attempting to drive away when Cox asked him if he could ask more questions. Defendant did not agree but instead replied by saying "what?" The testimony failed to indicate the context of that statement. A response of "what" could imply that defendant did not hear Cox's question and responded with "what" as in "what did you say?" Moreover, after responding that no illegal items were in the car, defendant again attempted to drive away. At this point, Cox asked defendant to stop and get out of the car. Based on the evidence, defendant desired to leave the stop and did not agree to further questioning or a search of his vehicle. A reasonable person in defendant's position would not have felt free to leave. Therefore, defendant's conduct cannot be considered consensual. Id. at 1310. Thus, the validity of the search and subsequent seizure of the cocaine turns on the existence of a reasonable and articulable suspicion of illegal activity.

In determining whether reasonable suspicion exists, the court again looks to the "totality of the circumstances" to determine if Cox had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Reasonable suspicion may exist even if each factor alone is

"susceptible of innocent explanation." Id. at 277 (stating that "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct"). A determination of reasonable suspicion to detain after a traffic stop should be based on the totality of the circumstances. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

In making the determination, each factor is not to be considered in isolation because even though one factor alone may be innocently explained, the factors considered together can support reasonable suspicion. United States v. Lopez, 518 F.3d 790, 797 (10th Cir. 2008). The court must "be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Id.

Here, there were other indications prior to the stop that would support a finding of reasonable suspicion that defendant had received a package containing contraband.[5] Andrews, an alleged cocaine dealer who deals in large quantities, left his home after a short visit by a car that was seen at another suspected drug house under

---

[5] While Officer Cox did not observe all of the actions prior to the stop and did not have the knowledge of the information from the trash pull and the CI, the court must also "look to the knowledge of all the police involved in this criminal investigation, since probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest" when making a determination of reasonable suspicion. United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003)(citing United States v. Merritt, 695 F.2d 1263, 1268 (10th Cir. 1982), cert. denied, 461 U.S. 916, 103 S. Ct. 1898, 77 L. Ed.2d 286 (1983); see also United States v. Swingler, 758 F.2d 477 (10th Cir. 1985) (finding probable cause for automobile searches and the arrest of their occupants based on knowledge possessed by FBI agents, not the arresting state officers, that the defendants were transporting amphetamines)).

surveillance.  Andrews then met an individual in an apartment complex and left with an empty bag.  That individual, Gunter, had a white bag and drove to a location where defendant was standing outside his car. In mere seconds, Gunter handed off a white bag to defendant and defendant placed the bag in his back seat and drove away.  When later approached from behind by a marked unit defendant quickly pulled into a parking lot and walked up to a store where he did not enter but instead looked back in the vicinity of the now absent marked unit. Defendant then left the parking lot.

Goodwin testified that Andrews' actions in leaving with an that Gunter had the cocaine, which he then gave to defendant.  Goodwin also opined that the transaction between Gunter and defendant was a typical drug transaction in which the drugs were quickly exchanged.  His opinions in this regard were not challenged.  The court finds that based on the surveillance, the trash pull and the CI's interactions with Andrews, Goodwin had more than enough information to believe that Andrews was dealing in large quantities of cocaine.  While the evidence offered by the government was not overwhelming (e.g. no one saw defendant place the white bag in the trunk of the Intrepid), the court is reminded that "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause."  Id. at 799.

Because the officers had reasonable suspicion to believe defendant was engaged in wrongdoing and that the vehicle contained narcotics, the investigative detention did not violate the Fourth Amendment.  Once the officers had reasonable suspicion to justify prolonging the stop for additional questioning, a drug dog sniff was

permissible. <u>United States v. Villa-Chaparro</u>, 115 F.3d 797, 802-03 (10th Cir. 1997). Moreover, a dog sniff performed during a traffic stop does not violate the Fourth Amendment, as long as the detention is not unreasonably prolonged. <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005). Here, it was not. It was not necessary to wait for officer Handcock and his dog; they were on the scene.

Defendant asserts that the drugs found during the stop should be suppressed because the dog only alerted when it climbed into the car. As a fallback position to the suggestion that the officers opened the door after defendant shut it, defendant argues that the door was left open because of the officers' conduct in forcing him to get out of the car. Defendant cites to two cases in which drug dogs did not indicate the presence of drugs until they were inside a vehicle, <u>United States v. Stone</u>, 866 F.2d 359 (10th Cir. 1989) and <u>United States v. Winningham</u>, 140 F.3d 1328 (10th Cir. 1998).

In <u>Stone</u>, the Tenth Circuit determined that the defendant's rights were not violated when a drug dog jumped into the open hatchback door because the dog's actions were instinctive. The defendant was asked to show officers a citation that he had received earlier in the day. The defendant opened his hatch to retrieve the citation and the drug dog jumped into the back without being instructed to by its trainer. The Tenth Circuit determined that the resulting discovery of the drugs did not violate the defendant's Fourth Amendment rights because the dog was not instructed to enter the back and did so instinctively. <u>Stone</u>, 866 F.2d at 364. In <u>Winningham</u>, the Tenth Circuit determined that the defendant's rights were violated. The officers in <u>Winningham</u> opened the door of the

-11-

defendant's vehicle and waited for the drug dog to arrive. The handler then released the dog as they neared the open door. The court determined that the officers in Winningham facilitated the dog's entry to the van. 140 F.3d at 1331.

This case more closely resembles the officers' actions in Stone. While Cox asked defendant to get out of the car, there is no evidence that Cox prevented defendant from closing the door behind him. The only credible evidence is that defendant opened the door and did not shut it. Handcock testified that the dog alerted to the passenger window and then went around the front of the car and leapt in the driver's side open door. Handcock had released he dog from the leash upon arriving at defendant's car, consistent with his standard procedure. There was no evidence that Handcock instructed the dog to go inside. Actually, Handcock testified that he did not want his dog going inside a vehicle because he was concerned for the safety of the dog. The court finds that the dog's actions in jumping in the vehicle were instinctive and that defendant's Fourth Amendment rights were not violated. Stone, 866 F.2d at 364.

Defendant also asserts that the officers should not have extended the search to the trunk of the car because the dog did not "indicate" that he smelled narcotics in the trunk. An indication[6] by the drug dog to the passenger compartment of a vehicle gives rise to

---

[6] The Tenth Circuit consistently uses the term "alert" when referring to drug dog searches. Handcock's testimony about the definition of "alert" is not consistent with the Tenth Circuit's definition. It appears that Handcock's definition of an "indication" is equivalent to the Tenth Circuit's definition of an "alert." See United States v. Stewart, 473 F.3d 1265, 1270 (2007)(the dog "alerted on the Tahoe's rear driver's side by aggressively scratching at it.")

probable cause to search the vehicle's trunk.  <u>United States v. Rosborough</u>, 366 F.3d 1145, 1153 (10th Cir. 2004).  Moreover, "an officer obtains probable cause to search the trunk of a vehicle once he smells marijuana in the passenger compartment and finds corroborating evidence of contraband."  <u>United States v. Parker</u>, 72 F.3d 1444, 1450 (10th Cir. 1995).  Handcock credibly testified that he smelled marijuana in defendant's car upon entry and that he discovered marijuana residue in the center console.  Defendant volunteered that he had smoked marijuana in the car earlier in the day and he has not sought to suppress that admission.  Based on the indication given by the drug dog inside the car and Handcock's discovery inside the car, the officers had probable cause to search the trunk.

Defendant's motion to suppress is accordingly DENIED.  (Doc. 81).

IT IS SO ORDERED.

Dated this __28th__ day of April 2008, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE